Our first case for argument today is 24-1772, VLSI Technologies v. Intel. Mr. Walker, please proceed. Chief Judge Moran, may it please the Court. The 836 patent at issue here claims both methods and apparatuses developed by engineers at Freescale Semiconductor that can speed up processor performance by running single-core tasks on the fastest core. I want to talk about three issues today. First, the U.S. nexus as to both the method and apparatus claims. Second, the claim construction that read in upon identifying limitation into apparatus claim 10 and the exclusion of VLSI's damages theories. Reversal is warranted on each of those. Starting with the U.S. nexus, there is no U.S. nexus problem because Intel expressly stipulated to the requisite U.S. nexus. The parties stipulated that of the total global number of Intel products and associated activities that are determined without regard to geographic considerations to meet the technical requirements of any asserted claim, that 70 percent of them will be deemed to have a United States nexus as required by each subsection of 35 U.S.C. Section 271, the provision that defines infringement as making, using, selling, offering for sale, and importing the patented invention in the United States. There's no dispute. I know you have a textual grammatical argument for why the stipulation should be read the way you prefer it to be read. But I do realize that the district court below thought it would be a peculiar thing for Intel to give up its territoriality defense for infringement purposes. And I'm sure if I ask Intel's counsel, they would say there's no earthly reason why we would ever do that. That's absurd. So the only person I can ask this question, then, is you. Why would Intel give up its territoriality defense for infringement purposes? In order to streamline the case. I understand that. But this could easily, you know, stipulations like this typically go more towards a damages question, not so much an administrative convenience question. Sure. Sure. Well, I think it's important to remember that this was early in the case. There were eight asserted patents, not just the 836 that we're arguing about now. And there were scores of accused products. If you go into all the submodels, probably hundreds of them. Some of those products might have had close to 100 percent U.S. nexus. They were all sold in the United States. Others might have had a lot less. But parsing through all of that in discovery for all the products, all the patents at issue, that could have been overwhelming. So Intel decided to compromise. It wasn't, you know, it said it was going to be 70 percent U.S. nexus for any products or activities that meet the claim limitations. Sometimes that might overstate what the U.S. nexus was. But for others, it was going to understate it. And Intel decided that it was better to avoid the time, expense, and burden of going through that in discovery and later at trial. Did it already disclose its territoriality defense for purposes of the 836 patent and the ATE tester being located offshore? I don't know at that point if they had gotten into the specifics of that. They had raised the issue that they may challenge U.S. nexus. And I think it's actually helpful to look at the Hirsch letter that Intel cites. This is at Appendix 8230. Now, this is about six and a half months before they actually signed the stipulation. The e-mail? I think it's a letter. It might have been sent by e-mail. But it is raising issues about where things are being made, shipped, and sold. Those words actually track Section 270, what it means to, in French, make, use, sell, in the United States, import. And it actually flags. This is at the top of 8230. It says that there are some products that are only shipped through the United States. And it says those aren't U.S. sales. But you know what? We'd be willing to stipulate that they have a U.S. nexus. If you don't stipulate, we're going to fight you on that. But we would be willing to stipulate. So I think that shows that early on, Intel showed a willingness to stipulate to U.S. nexus for products that it thought that it would have been able to defeat U.S. nexus had it gone all the way to trial. Just as a matter of, you know, big picture law, this is what I'll refer to as, like, sort of parole evidence. When we're looking at the stipulation itself, if we perceive the language of the stipulation to be clear on its face, we don't necessarily need to turn to and contend with the back and forth correspondence that led up to the stipulation. I think that's right. I think it is clear on its face. It says, for purposes of Section 271, that only U.S. nexus. But I'm not asking you whether you think it's clear on the face. Yes. I'm asking you a legal question. Yes. And the legal question is, if the Court concludes the language of a contract, which is what this is, is clear on its face, under what circumstances should the Court turn to extrinsic evidence outside the boundary of the contract to try to understand the terms of the contract? So here I think if it is clear, you go to the four forms of the contract. I agree with that. I'm just pointing to the letter because Intel has pointed to it, and I think it actually helps to neutralize the argument that there's no chance that they would have agreed to this kind of stipulation. And that letter also says nothing about damages. The word damages doesn't appear in it. It does use the word infringement. It's talking about sites cases like Halo and Deep South that are about the U.S. nexus that's needed for infringement. So if you were to look at it, I don't think you need to go there because the stipulation itself is clear. But I think that letter reinforces that this is something that Intel, you know, reasonably could have thought it was a good idea at the time. What is our standard of review on this extraterritoriality question? It's de novo. It was a grant of summary judgment, which was de novo, and it's interpretation of a contract because of legal questions. But the opponent's position encourages this Court to take a draconian view on something that could just simply be sloppy draftsmanship. Why should we do that? Well, I think the Court may have faced similar kinds of arguments in Kearns versus Chrysler. Chrysler was trying to escape what it thought were draconian consequences of a stipulation it had entered into. And this Court says, no, the public policy here is enforcing contractual obligations and especially enforcing litigation stipulations. They streamline litigation. And if you let parties out of their stipulations despite their clear terms just because that seems in hindsight unfair or that a multibillion-dollar company wouldn't make that kind of step, again, I think the reasoning is they wouldn't. But Kearns says courts can't let parties out of their agreements that way. It would interfere with the orderly administration of justice.  And to the Chief Judge's point, we're dealing with basic principles of contract law. So if there is such a material dispute as to the meaning and intent and application of the stipulation, do we have an actual stipulation? Is there a sufficient meeting of the minds on this point? I think the words there are very clear. They're crystal clear. There's been no meeting of the minds defense that has been raised to enforcing the stipulation. We all agree it should be enforced. The fight is only over what it says. We think it's clear that it is reaching the question of infringement under Section 271. Let me just ask you a couple of maybe housekeeping questions. I mean, when we interpret contracts, I understand the law suggests that you could sometimes interpret the contract against the drafter. Was Intel represented by counsel? Was there counsel involved when this stipulation was drafted? I am not sure. My understanding is that the You're not sure if Intel was represented by counsel? I am not sure precisely who represented, who negotiated it. But my understanding is that litigation counsel were certainly involved in the drafting and agreeing to this. Yeah. Lawyers from both sides signed this. Yes. These are sophisticated parties. And I think if you're saying that you stipulate to the nexus required by 271, you're stipulating to the nexus needed for it to prove infringement. But you probably could have answered this question by just pointing out that their counsel signed the stipulation. Oh, okay. Thank you. Yes, I agree that counsel signed it. And I think that's one more reason to enforce it by its plain terms. I'd be happy to talk more about the stipulation. But I can also say that with respect to the apparatus claims, there's a U.S. nexus even if you don't look at the stipulation. And that is because apparatus claims are infringed so long as the patented invention, something that satisfies every claim limitation, is sold, offered for sale, or imported in the United States. This fits into the role and nature of the ATE tester when it comes to performing the measuring step, right? Yes. Intel has tried to make it about that. And so as far as I could see, that issue wasn't really ventilated below in front of the district court. In other words, I don't know to what extent the parties really briefed to what extent is the circuitry inside Intel's cores actually capable of doing the functionality of the measurement step. And therefore, the ATE tester is really doing nothing more than activating the circuitry inside the core versus the ATE tester actually having a much more of those PIST circuits inside the cores. That would, therefore, then make the ATE tester look like it's, I don't know, at a minimum part of the measurement circuitry. Yeah. So that is just a pure infringement question, setting aside extraterritoriality. And the only infringement question the district court addressed dealt with the limitation it had read into the claims. And so I believe Intel did not make any argument that standing alone, setting aside the location where things happened, that there wasn't infringement with respect to the performance measuring circuit. And this is summary judgment. All we had to do was provide evidence that a jury could find that that happened. Our expert, this is Appendix 6247, Section, or Paragraph 339, Paragraph 344, Paragraph 493 in our expert's report. I think these are all things that sufficiently show that he said he provided evidence that a jury could credit and say the circuitry is in there, the structure is in there. Can I ask a housekeeping question? If we agree with you on the stipulation, is there any reason that this court needs to address this question regarding the apparatus claims? It would be prudent to do so. I don't want to hear what you think is prudent. I want to know if I have to address it. If the court understands the non-infringement argument with respect to the apparatus claims to only be about extraterritoriality, which is how it was litigated below, then I think the stipulation resolves that. If their argument is the chips just don't infringe ever because the ATA tester is apart from it, then that would govern the presumably how the case goes. Well, if the ATA tester is apart from it but it's outside the U.S., then doesn't the extraterritoriality stipulation cover that question? I am happy to agree that it would if Intel was But the problem is that what you accused of infringement is the core, the multi-core system of Intel. You didn't accuse the ATA tester in combination with those courts. Yes. And, therefore, if the ATA tester really does play a meaningful role in the performance of the measurement step, then, therefore, you didn't accuse the right thing by failing to accuse a combination of the Intel courts with the ATA tester. That's the theory. That is the theory that we're hearing from Intel here on appeal, and I think the answer is that claims are directed to the core. There is evidence from which a jury could find that it has the required circuit, and there is nothing that would require a jury to find at the summary judgment stage that the ATA tester was anything more significant than something that activates or executes it, like the operating system in silicon graphics, like the base stations on the INVT, or like the unlocking key infringement. Now, we're running low on time, and I'd like you to move to the prosecution history sample disclaimer argument, please, and the three statements. The one I want you to focus on is the one on 1106, the CEG one. Is it the claim 10 argument? Yes. So that is the only one that says, upon identifying, none of the rest do. And I think so this is not distinguishing any prior art. This is just a general overview of what is disclosed and claimed in the specifications. Do you think that's a requirement for there to be prosecution disclaimer? I think if, for example, an applicant said, my claim is directed to this. My claim requires X. And X isn't literally in the claim. And at the same time, when the applicant says that to the examiner on record, the applicant isn't actually at that point in time distinguishing prior art, but is just saying something in a very definitive and clear way. My claim requires X. You're saying that that wouldn't amount to prosecution disclaimer? I think it would have to be clear and unmistakable that they were surrendering claim scope. And here, the order of operations that the upon identifying limitation signifies was something that was never addressed. They never said, yes, this order of operations has to be. And I don't think that this sentence.  I'm just trying to test what sounded like a proposition to you, that any prosecution statement made by an applicant that isn't specifically distinguishing prior art necessarily cannot be prosecuted. I don't think that's absolutely true. But clear and mistakable is the standard, and that's going to be even harder when it's just a general statement about what is in the specification and not trying to distinguish prior art, especially when upon identifying was never invoked to distinguish prior art and not an issue that anyone was fighting about. So what do you think is going on here with this statement that is tying all of the independent claims to a description of the claims that, among other things, talks about upon identifying a single core only task, selecting the fastest course? So I think it's talking about an exemplary embodiment. And how we actually know that that sentence is not purporting to cover the full scope of Claim 10 in particular is because it says selecting the fastest core. And Claim 10 does not require that it be the fastest. It says it can have a minimized or a maximized parameter. And so Claim 10, by its plain terms, is a little bit broader than that.  So you're saying if we were to really restrict Claim 10 to the words of this statement at 1106, we would have to be crossing out words in Claim 10. I think that's right. It's all about minimized performance parameters. I think that's right. And there's no reason to read that into it. I'm just going to extrapolate from that and say, therefore, is your argument also that Claim 10 absolutely includes but does not require identifying a single core? Like, it absolutely includes both, just in the same way that it includes the fastest. Yes, yes. This describes what it includes. It does not try to limit it only to that and doesn't say anything about what it excludes. Can you now touch upon damages? I'm going to extend your time a little bit and I'll extend the other side's time to balance out the whole thing. But I'd like you, if you don't mind now, to move and touch upon damages. Yeah. Thank you, Your Honor. I think Judge Alsup in the Master Objects case put it well when he said that the local patent rule 3 does not require identification of every evidentiary system of proof. The point is, are you giving reasonable notice of what the damages theory is going to end up being? We review this for abuse of discretion, right? It is reviewed for abuse of discretion. But I do think that if the Court was ratcheting up the legal standard that this rule requires, a legal error is an abuse of discretion. I think Master Objects, I think this is what litigants in the Northern District of California are going to understand the rule to require and not require. In Master Objects, there was a disclosure that we're going to do a per-unit royalty. Do you think citations in a very, very long string cite is good enough to provide adequate notice? I think if we're describing what the methodology is and then the factual support appears, sometimes it's going to be in string cites because there may be hundreds of documents that are being cited. Here, there were hundreds of thousands of documents that were produced. And so, you know, if there's a lot of documents that are relevant to that, it's unavoidable that you're going to have really long citations. Isn't the point of the local rule to avoid that, burying the notice in a string cite as opposed to simply stating it? So I think we did state it. We said we were going to value, base damages on the value of the technological and economic benefits of the invention to Intel and that we were going to rely on Intel's own internal evaluations for that. These citations were two things that documents from Intel that supported that. We cited and quoted an e-mail that provided, you know, it was a round number, but it provided one of those valuations that Intel was relying on by McGlurk. And then later we cite, by name, the McGlurk deposition where he admits that he offered a presentation. And then the next sentence, we cite the presentation that he offered that has the 345. We still have other damages theories that were not excluded, right? There's a confidential license theory that was not excluded. Let me actually tease this out a little bit. And just somebody wave hands in the air if I say anything confidential. I don't think I'm going to, but I respect that parties have designated some portions of this confidential. There are two different damages theories that were excluded. One is the NVP and PV theory, and the other is the VPU theory. I personally see a difference. I'm not sure the outcome is different, but I don't see how your contentions gave any hint that the NPV theory was going to be proffered. I don't see that it does anything at all except list a particular number that I think is confidential in a long string site about recently produced data illustrating Intel's testing. I don't see how that's sufficient to put them on notice of your intent to proffer an NPV theory of damages. Now, this is distinct from the VPU theory. So tell me why it is that you think that quite limited disclosure on your part, that never mentions the theory itself, suffices, and why it was an abuse of discretion for the district court to exclude that portion as opposed to the other portion. Okay. So NPV theory is maybe a little bit of an overstatement. Our theory was we're going to base it on Intel's own valuations of the value of the technology to it. And NPV, net present value, is actually Intel's internal term. And what we did is we cited and quoted the email that provided that confidential but round number that is roughly approximate to the $345 million number that our expert ultimately used. And so that's on 2203. And then the pages that are coming after are explaining here's the documents that we have to support that. And they include the presentation that details where that round number mentioned in the email ultimately comes from. We said McGlowick sent this email that has this round number that we're talking about. And a few pages later we're citing his deposition that says he offered a presentation and then we cite the presentation itself. But I don't see how you tailored. I mean, I feel like you have a single quote on 2203, but it doesn't feel very tailored to what the methodology is going to be that the expert is going to use to articulate the damages theory. Yeah. So I think it says we're going to rely on what Intel has valued and quotes one of those valuations. It's a little bit more of an estimate, but it leads you directly to the exact number that our expert ended up relying. Is that what it says at 2203? We're going to rely on Intel's valuation? Yeah. Yeah, so at the top of that page, the first full paragraph, that it provides significant benefits reflected in Intel's marketing materials. And then it has at line 10 is the or 9 through 10 is the email with the quote. And that's by Mr. McGavick. And then if you go to just seven pages later, the McGavick deposition is cited at 2210 at line 16. Same guy who sent that email that has that big number that we have just flagged as Intel's valuation of this. Right. He explains I. That's inside a parenthetical around the quote. The quote is inside a parenthetical, but I think it is still pretty prominent. I think if you've got all the lawyers that Intel has reading these documents, I think they're going to notice it. And then we've also pointed to the deposition that says, I made this presentation that actually shows what the modeling was, and the presentation is cited in the immediately following sentence. Okay. We'll save a little bit of time for rebuttal, but let's hear from opposing counsel. Thank you. May it please the Court, Dominic Massa for Intel. If I could start with the apparatus claims and address Judge Chen's question. Before you start with the apparatus claims, answer my housekeeping question. Which is, do we even reach that issue if we agree with them on the stipulation? Yes, Your Honor, because as Judge Chen pointed out, the theory of infringement for the apparatus claims is that the chips, the device as sold would infringe, not the chip plus the tester. So we're not talking about potential damages flowing from a use or a piece of equipment or a combination made overseas. While you might have that infringement or non-infringement defense, it's not so clear to me that that particular non-infringement defense was actually ventilated below in your summary judgment motion. It seemed to really be geared towards this territoriality question. And obviously there's some language in Judge Freeman's opinion that could be read to also bake in this capability of. But I don't know if we really have any analysis on that score as to what is the role of the tester other than the fact that it has one. But if it's a really limited role, then it actually might not count in terms of whether or not the PBIST inside the chip is reasonably capable of performing the measurement step. It's a substantial role, Your Honor, and it was ventilated. And at the Appendix 7-631, you'll see in the oral argument, Judge Freeman says, so looking at the substantive argument, which Intel has briefed. I'm not interested in what Judge Freeman may have brought up. I'm interested in where in your summary judgment brief you made this argument. Because if you didn't make the argument in your brief, it doesn't put the opposing counsel on notice. The fact that Judge Freeman may have brought this up in the hearing is great, but that doesn't really give them notice to respond to it. So where in your brief did you ventilate this issue? We did brief it, Your Honor, and it's addressed in Judge Freeman's opinion in Appendix 29.  But we're trying to look at your summary judgment motion, 6197. I don't really see anything there that says we're going to tell you a story about the ATE tester. We're going to tell you about how it's the master of the performance of the measurement step, and it has to do some kind of programming of the PBIST inside of our Intel chips. And only in that way are those PBIST chips able to do the measurement step. I don't see anything like that in 6197. In 6197, we address the issue that there was no evidence presented by Dr. Conte. We address this issue. We asked Dr. Conte at his deposition, and that's why we cite to it on 6197. We asked him, can the accused products, the chips themselves, perform this testing? And he unequivocally said he offered no opinion on that, and that's his deposition at 8088 in the record. We asked him, are you saying it's the device plus the tester or just the device? In our case law, we have examples like FinGen. The software there could not perform the claimed functionality unless it was unlocked and it needed a key. And we said the addition of a key doesn't change the analysis. It's software infringence. Same thing with Silicon Graphics, I think. We said that the accused product couldn't infringe without an operating system executing the functionality. So the operating system isn't really affecting the fact that the accused product is capable of doing it. It just needs a little bit of an operating activation. And so that could be the same thing. We don't know because the judge below never was confronted with the issue and so never addressed it as to whether or not the tester is really nothing more than an activation component. We do know. So Judge Freeman addressed the evidence to find whether there's sufficient evidence for this question to go to the jury. On the one hand, you have the deposition testimony of Intel engineers saying we used the tester to actually measure voltage. The tester, not the chip. It's a measurement limitation, and the undisputed evidence, and this is at 8141 and 8149, is that on the one hand, Intel engineers saying the tester does the measurement. On the other hand, nothing. I mean, I don't know why that necessarily conforms with the actual claimed performance of measuring which core is the fastest. That was Dr. Conti's infringement opinion, was that by measuring the voltage across some circuit in the chip, that from that you could determine which of the cores were the fastest. And that was his theory, and his theory was only the combination of the accused products plus the ATE tester. And we asked him, are you saying just the accused products themselves? He said he has no opinion. That would be hypothetical. He hadn't even considered it. Again, at 8088. That was the evidence on BOSI's side. On Intel's side, the evidence was uncontroverted, undisputed, testimony of Intel engineers saying that the tester does the voltage measurement. There's not a measurement coming from anything on the CPU. That's the accused product. And that's at 8149. And again, at 8195, we say we need this tester to program what's inside the chip in order to tell it what to do. That is distinguishable from FinGen and Silicon Graphics. And the answer is no.   FinGen, it was undisputed that everything needed to meet the claim was inside that software, and all you needed was a key. And FinGen said... Can we just go to the stipulation? Sure. On the stipulation, Your Honor, there... I'll be honest. If I just read it, you know, in a vacuum, it reads the way your opposing counsel would read it. And, Your Honor, there's no need to read it in a vacuum. So the stipulation itself has whereas clauses which describe the context in which it arises. The wherein clause is specifically referred to the letters between Mr. Hirsch and Ms. Proctor. This letter, which is in the record, describes what is happening here. These are members of each party's damages team. They are talking about damages-related documents that were produced that are spreadsheets with millions of lines... Counsel, your stipulation says nexus required by each subsection of 271. That has nothing to do with damages. 271 is nothing but infringement. And you say we will deem the U.S. nexus as required by each subsection of 271. Now, maybe if that's all you said, I would think, well, they said 271, but they really meant 284. But you said and for determining patent damages. So you separately addressed infringement and you separately addressed damages, and you made it crystal clear that this stipulation applies to both. And you didn't even just use the word infringement. You used the word infringement and you quoted the you cited the section of the statute that only has to do with infringement. And you say and every subsection thereof. And the stipulation only... What were you thinking? The stipulation only applies...  Did you draft this? I didn't personally, Your Honor, no. Was your firm involved in drafting it? Yes, Your Honor, and we stand by it. The stipulation only applies when there's a determination of infringement, when the technical requirements of infringement are met. Without regard to geographic considerations. Bingo. The total global number of sales is without regard to geographic location because... That's not what you wrote. I'm not even close. Like, your view of this is truly unreasonable. Unreasonable. VLSI's view of this was considered absurd by the district court judge who was closest to this. And Your Honor, so I've characterized this as should we enforce a contract, particularly when it's a stipulation of something in the litigation. The district court judge closest to this litigation, knowing how these stipulations came about, thought VLSI's argument was absurd. The stipulation itself says three times. This is no admission of infringement.  The other aspects of infringement. But it is an issue of infringement with regard to territoriality. And that's the only thing this addresses, territoriality. The only thing this was used for, you can see in Dr. Sullivan's report, is he takes the global number of sales and multiplies it by the nexus number. It's just to take .7, 70 percent, and multiply... Mr. Walker explained, at the time this stipulation was entered into, there were eight patents at issue, hundreds of products at issue, some undisputedly wholly performed aspects in the U.S., some that didn't. To be frank, how am I supposed to look behind a litigation strategy? It may well have made a lot of sense to Intel to not want to have to give you tens of millions of dollars to deal with all the discovery that would need to happen for that, and much easier for them to say, we'll just agree to 70 percent on the infringement and damages, because whether I'm paying them the 70 percent or I'm paying you tens of millions of dollars to litigate eight patents and hundreds of products, product by product, on these extraterritoriality claims, I mean, I don't really generally look behind stipulations like this when they're so clear on their face, because I'm smart enough to know that I can't understand what was going on in the party's heads when they were doing their cost-benefit calculation over who they want to give money to. Lawyers who are going to charge them tens of millions of dollars in attorney's fees versus the patentee. And so that, I read the stipulation on its face and assume Intel was a rational actor, well-represented by good counsel, and this was the calculated decision they made. Respectfully, Your Honor, there's $5 billion in damages claimed at the time this was entered into it. It wasn't to save some dollars in lawyers' fees. 70 percent of $5 billion is a lot better than 100 percent of $5 billion. Of course, Your Honor. This BSI would have you read this as an unmistakable and clear waiver of an ironclad non-infringement defense. Ironclad non-infringement defense. It's undisputed that there's Ironclad in hindsight. You didn't have all the discovery. None of the discovery had taken place to make it crystal clear that there was or was not extraterritoriality, and the case wasn't reduced to just these patents and just these products at that point in time. So, I mean, you might, ironclad in hindsight is a wonderful thing for an infringer in patent cases. Undisputed that we never performed this method in the United States. It's undisputed that all of Intel's testing occurs overseas. It's just curious. Intel knew that. By January 2019, the date of the stipulation, did you already disclose your infringement defense that, well, we do our testing of the measurement step outside of the country? I don't believe that there's a record site for that, Your Honor. But there were at the time. The case had been stayed for IPRs. But the stipulation was trying to cover a whole bunch of patents, not just the 836. Some of them had dropped off by that point in time. But, yes, more than just the 836. And for claims where there's a method that is performed by an end-user customer and there's an argument that that's acute, that occurs in the United States and we might be liable for inducement, then that's used. The big hang-up I'm having, or one big hang-up, is the word and. And you heard the Chief stress that word inside the stipulation. What is being deemed as having a United States-U.S. nexus is for purposes of 7271 and for determining patent infringement damages. It feels like there's two different separate thoughts that are operating here and not just one mushed-together concept that damages exclusively. The reason that 271 is referred to, as you can see in the other section. Why is the and there? How does the and – how do I write an opinion that says, well, don't worry about the and? Because all of this sentence, whatever is going on here, is just for the last clause for determining any patent infringement damages. The and is there because there were multiple theories put forward by VLSI under various sections of 271. There is inducement. There is direct infringement. There is perhaps they even claim supplying components for manufacture overseas under 271F. So it is a blanket reference to, of all the different ways in which you may be asserting infringement, not just limiting it. Because the HALO case, I think, is instructive. HALO, you had no damages, no infringement for direct infringement because, again, it was quite similar to HALO. It was undisputed that certain activity only occurred exclusively outside the United States, but there was a finding of infringement for inducement because you can have in this global commerce, you can have a stream of products put out there with various activity that goes to, you know, a sales contract. Where is the sales contract negotiated and things of that nature?   And if you go back, you would still have other infringement defenses. Absolutely, Your Honor. This we don't admit that we ever performed the method, let alone that we perform it overseas. We say we performed the testing, but that we certainly don't dispute that that. We certainly don't deny. Or that your chips ever do any identification of a single core. Right. We never identify the fastest core, period. So there are non-infringement defenses which certainly would survive a remand,  But, again, the stipulation would be absurd under the reading of VLSI. It has the stipulation that says three times there is no admission of infringement and that the technical requirements of infringement must be met. For this claim You talk about the prosecution statements. I know you want to talk more about the stipulation, but we're running out of time. Thank you, Your Honor. The patentee argued these claims together. And they argued claim 1, 10, and 20 together. And they made the statements that they made in the context of a prior right rejection. And they said that all of the claims. And is it fair to say that this statement of JA1106 was not made in the context of distinguishing prior art references? The statement is made in the context of distinguishing the Kim reference. And it says that. Well, I see the statements being made at JA1107 as distinguishing Kim and maybe Bernstein, too. But the 1106 statement seems really to be more of an introductory statement or a general summary statement of the claim. Well, the whole section there, section B, is an argument about trying to get over an obviousness rejection over Kim. That's the section which 1106 and 1107 both address. Let's assume for the moment that 1106 is a general introductory summary of what the claims are directed to. And 1107 is really where the action is occurring in terms of distinguishing the claims over the prior art references. Are you aware of any precedential opinion that says a general summary description of what the claims are directed to can suffice for prosecution disclaimer? I tried to look for one. I couldn't find one. I don't have one in mind, Your Honor. But Judge Friedman found this to be clear and unmistakable disclaimer. And I think there's some action also at 1324. This is an examiner-initiated interview and the summary of that. And it said, It was agreed to amend Independent Claims 110 and 20 to clarify that a core is selected from the plurality of cores when it is identified that a task cannot be run across the plurality of cores. Again, this is an agreement between the applicants and the examiner. This is what prosecution history, this is what disclaimer is based on, the agreement between the applicant and the patent office, the agreement between the applicant and the public of what their claims is limited to. And they agreed, and that's the reason they got this patent, is that they clarified for the examiner, both there and in 1106 and 1107, that what happens here is identifying a task as being a single core task and then selecting a core to run in it. And in 1107, when they address Kim, they say that Kim doesn't have this identifying, much less of assigning such single core tasks to the fastest core. Also, as a matter of logic and of grammar, you don't assign a single core task to a core unless you know it's a single core task. Their reading would read out single core tasks and just say, if I happen to assign any task to a core and by happenstance later it turns out to be a single core task, I've somehow met this claim. It's not the case. You don't have a single core task to assign unless you've identified it as a single core task. Could I ask you, unless anyone has more questions on this, to move to the damages? Do you have more questions on this? Not on this. I've got to circle back, but let's go to the damages. Oh, okay. Can I ask you to move to the damages, please? Certainly, Your Honor. So the circumstance here is important. We had moved to compel more definite statements according to VLSI's failure to meet the local rule, and the Court had found that VLSI's initial statements had failed to meet the local rule. This is purely a matter of discretion for the district court in implementing the local rules of her district as well as her order compelling VLSI for not only to provide the documents but an explanation of why. Counsel, explain to me the leap from if there was an order compelling this disclosure how the exclusion came about, the exclusion of the expert's opinions on these two issues. Sure. So what happened was there was an initial set of contentions, damages contentions. We moved to compel on those. The Court granted that. There were then five additional supplementations over a period of five years, never, never disclosing this theory and how these documents would relate to this theory. As one of Your Honors pointed out, there is a seven-page string site which I think by happenstance just happens to include one of the documents that their expert now wants to rely on, Mr. Sullivan. But that was never explained to Intel. If it had been, then discovery could have been taken of the author of that document. Discovery could have been taken of the recipient of that document. And that's why Intel would have been prejudiced by, in effect, burying that site in a site amongst hundreds of documents. And, again, this is the district court, you know, enforcing her district's as well as her order to compel more definite statement. Not just a laundry list of documents, but an explanation of how those documents support the theory. Let me ask this question. If VLSI prevails on any of the other two issues, and this case is remanded in some form or fashion, should we affirm the exclusion order still? Yes, Your Honor. I mean, I think the first two issues should get rid of the appeal. We shouldn't reach claim construction or the damages. But, yes, if you were to remand, then you can affirm this order. VLSI has other damages theories, and the district court can deal with how those theories could be dealt with in a remand case. Even if different segments or parts of the case are basically subject to a reset button? Yes, this is a separate issue.  Chief Judge, can I circle back real quick? Of course, please. You mentioned logic and grammar counsel, and I'm in the same spot as Judge Chen. I have a very difficult time avoiding the word and in the stipulation and why this court should blue pencil that now with the benefit of hindsight, as the Chief Judge mentioned, that Intel has realized what the plain language of that stipulation may suggest. Why should we do that? We're not asking the court to blue pencil that and, but what this court would need to do in order to give VLSI's argument credit, would have to blue pencil the places where it says three times that this is no admission of infringement, where it says that the technical requirements of infringement need to be met before this stipulation even kicks in. The technical requirements of infringement include performance of a method in the United States. There's no infringement unless the method is performed in the United States. If the method were performed in the United States, like perhaps other claims of other patents that may be infringed by a customer by performing a method, then you take the global number of sales and you multiply it by .7. All the stipulation is doing is providing that .7 number versus .6. It only kicks in after determination of infringement, and you'd have to ignore the rest of the stipulation where it says repeatedly this is no admission of infringement and it's still VLSI's burden to prove infringement, at least one instance, a use in the United States of a method, an apparatus in the United States that's capable of performing testing. And there's no evidence on either of those. Thank you, Chief Judge. Absolutely. Okay, thank you. Thank you. Mr. Walker, give me three minutes.  Thank you. I don't want to belabor the stipulation. I'd like you to jump to 1324. 1324 is the examiner interview because that is not something that I think that you addressed in the blue brief or the gray brief. And he brought it up in oral argument. Yeah, I think it was in the gray brief very briefly, but I'd like you to address what, if any, impact the examiner's summary of the interview has on the question of whether you gave up in the CEG site a timing concept. Yeah, so I think as a first matter, it would be very, very hard to find something that the examiner said to be a clear and unmistakable surrender of claim scope by the applicant, especially when the point at issue upon identifying order of operations was not anything that had to do with the rejections or the amendments that came out of it. I cannot find the site right now. I believe the district court rejected reliance on that for exactly that reason. I don't believe it appears in the argument section of Intel's brief. So I don't think that some loose language is going to be helpful. And when can just mean at the same time. So it doesn't itself require a strict order of operations. An earlier VLSI versus Intel case says that when can include at the same time as. So that's substantially simultaneous with. So I think for that reason, too, the word when is not going to be a disclaimer that doesn't otherwise exist. On the stipulation, it also says no admission about damages. So how could it do anything with damages, which is Intel's position? I think that shows the no admission language is very limited. It just says it's not admitting anything beyond the U.S. nexus. They say they had an ironclad non-infringement defense based on extraterritoriality. They certainly didn't with respect to the apparatus claims, which are still hotly disputed. We certainly think that we have the better of that, at least on summary judgment. And just to be clear, this stipulation would only give you 70 percent for apparatus claims, even though you – there's no extraterritoriality potential argument on the apparatus claims, right? I mean, they may have sold some outside of the United States. I don't know what the sales might be. But if there were 100 percent, we would be giving up that 30 percent, certainly, under the stipulation. We gave up potential upside as well. On the apparatus claims, the only basis for Intel's summary judgment of non-infringement was the extraterritoriality ground. If you look at their motion 61 – So does that mean you do not perceive the district court judge as having separately concluded on this capability of issue? I do not view her as addressing – Did she cite IMVT? I believe she did cite IMVT, but it was – has to be reasonably capable of it. And then she added the extraterritoriality aspect of it in the United States. I think that was the error, is adding the territoriality of the functionality into an IMVT-type analysis. So you – so that's still potentially a live argument to be decided by her on remand? I don't think it was ever presented to her on summary judgment. Intel says only that we can't show it's capable in the United States. That was 6197, line 18. That's their summary judgment motion. So I think it was only extraterritoriality and that they have not presented a standalone non-infringement argument. And I imagine if we concluded it was presented, you'd say there's a genuine dispute of fact because you had expert testimony contradicting it, right? Yes. And they certainly did not present evidence that compels a finding that the tester is more significant than the operating system in Silicon Graphics. They cite what our expert said about that. Imagine the expert in Silicon Graphics. Can it rasterize if it's not connected to an operating system? I haven't looked at that. Probably not. It still would have infringed. The Court was clear of the fact that you need the operating system in order for it to function. It doesn't take it out of infringing by itself. It's the same deal here. Anything further? Unless the Court has further questions, we'd ask that the Court reverse. Okay. I want to thank both counsel for argument, and I just want to say I understand, Mr. Walker. You parachuted in at the last minute. And for purposes of your client, sometimes a more junior attorney who was probably heavily involved is often a better choice. Thank you, Your Honor. Excellent.